IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

**SPM MANAGEMENT, LLC**
**t/a SALT PONDS MARINA RESORT**

and

**NORTH 37 MANAGEMENT, LLC,**  CIVIL NO. 4:16cv168

    **Plaintiffs,**

v.

**Motor Yacht SEA AYRE V, Official No.**
**923838, a/k/a SEA AYRE IV, her engines,**
**tackle, equipment, etc.,** *in rem***,**

    **Defendant.**

## OPINION AND ORDER

This case came before the admiralty court as a non-jury trial on December 6, 2017. Plaintiffs SPM Management, LLC t/a Salt Ponds Marina Resort and North 37 Management, LLC ("Plaintiffs") sued Defendant Motor Yacht Sea Ayre V, Official No. 923838, a/k/a Sea Ayre IV, her engines, tackle, equipment, etc. (the "Sea Ayre"), in rem, claiming that Plaintiff had a maritime lien on the Sea Ayre for unpaid wharfage. On November 29, 2016, Dororkes K. Ayers and Elizabeth Ayers Kerr ("Claimants") filed a verified claim of ownership over the Sea Ayer. ECF No. 10. Claimants argued Plaintiffs did not have a right to charge the Sea Ayre for wharfage because Plaintiffs did not own the slip where the Sea Ayre was docked.

The Court **FINDS** that Plaintiffs had a right to charge the Sea Ayre for wharfage and that Plaintiffs have a maritime lien on the Sea Ayre in the amount of $10,124.80.

1

I. **FINDINGS OF FACT**

The Court makes the following findings of fact.

A. SALT PONDS CONDOMINIUM COMMUNITY AND MARINA

In the late 1980s to early 1990s, a group of investors formed to purchase what is now Salt Ponds Marina Resort from its initial owner and developer. The marina ultimately included condominium apartments, common areas, and several floating piers that contained boat slips. Most, but not all, of the boat slips were made condominiums pursuant to the Virginia Condominium Act and sold to private owners.

At issue in this case is a floating pier called "E Dock." E Dock contains eleven boat slips, eight of which are condominium units. The floating pier is attached to land by a ramp, and extends West from that land. It has four "fingers" perpendicular to the main pier that run North and South, two fingers extending North and two fingers extending South. At the end of the pier, there is a "T-head" that runs North and South for the width of the pier, plus the length of the fingers. An excerpt of the recorded plat[1] shows E Dock as follows:

---

[1］ The excerpt reproduced herein is a true and correct portion of the plat attached to the Amendment to and Restatement of Condominium Instruments for Salt Ponds Marina Condominium (the "Amended Declaration"), recorded in the land records of the City of Hampton on June 7, 1994 in Book 1110 at Page 0017, and received in evidence in this case as Joint Exhibit 11. See JE11 at SPM000101.

2



The condominium boat slip units on E Dock are labeled E-1 through E-8 on the plat. Those units include "the fixture which is that portion of the floating pier lying within the boundaries of the above described Unit[s]." Deed, JE19 at 4.[2] The boat slips that were not made into condominium units are designated on the plat as the areas labeled A.L. 14, Additional Land 15, and A.L. 16.

### B. THE AYRES PURCHASED ALL CONDOMINIUM UNITS ON E DOCK

Dr. Stephen M. Ayres and Mrs. Dolores K. Ayres, husband and wife, purchased a condominium apartment in Salt Ponds Marina Resort in 1987 or 1989, and were among the first people to purchase condominium unit boat slips, which they purchased in 1994. Specifically, Dr. and Mrs. Ayres purchased all eight condominium unit slips on E Dock.[3] According to Mrs. Ayres, she and her late husband made the purchase because they believed purchasing all of the

---

2. The deed further provides, "also together with and subject to all rights, benefits and conditions contained in the Declaration .... Subject, however, to the restrictions, easements and rights of way of record affecting said property. Together with all and singular the buildings and improvements thereon, rights and privileges, tenements, hereditaments, easements and appurtenances unto the said land belonging or in anywise appertaining." JE19 at 4.
3. Dr. Ayres was also one of the first members of the dock owners association at Salt Ponds Marina Resort.

3

condominium units on E Dock would allow only them to use the T-head slip at the end of E Dock (the "T-head Berth"). One of the early investors in Salt Ponds Marina testified that the sellers told potential purchasers that if a person bought all of the condominium units on a pier, the purchaser would also be able to use the T-head at the end of that pier. However, no party ever produced a deed or other writing conveying rights to the T-head Berth.

The Ayres used all slips on E Dock including the T-head Berth free of charge from the time they purchased their condominium units in 1994 until approximately May 2015 when the instant dispute arose. This use was not hostile or adverse, but with permission. Indeed, Claimants do not assert a right to the T-head Berth by adverse possession. See JE7; ECF No. 78.

In or about 2004, Dr. Ayres, Mrs. Ayres, and their daughter Elizabeth Ayres Kerr, purchased the Sea Ayre—a 75-foot Hatteras motor yacht—and began keeping it at the T-head Berth. See JE23 at 3; JE7 at 2 ¶ 6; JE32 at 2 ¶ 6.

### C. NORTH 37 MANAGEMENT, LLC PURCHASED SALT PONDS MARINA

In 2012, North 37 Management, LLC ("North 37") purchased property from Salt Ponds Marina Resort, LLC, including the commercial condominium property, 114 condominium unit boat slips, and "[a]ll those parcels of land designated as Additional Land 2 through Additional Land 50, both inclusive, as shown in the Amended Declaration." Asset Purchase Agreement, JE17 at SPM000461. The deed for this transfer is dated December 10, 2012 and was recorded on December 28, 2012 in the land records of the City of Hampton (Instrument Number 120-019537). JE10. The deed purports to transfer Additional Lands 14, 15, and 16 as shown on the plat excerpted above.

SPM Management, LLC ("SPM Management"), pursuant to a contracted with North 37, managed the marina and rented out the slips owned by North 37. Under the contract, SPM Management would enter into slip rental agreements with customers at Salt Ponds Marina

4

Resort's posted rates, collect rent, deduct its commission, and remit the remaining funds to North 37. SPM Management also managed properties owned by people and entities other than North 37 according to the same terms. Relevant here, Salt Ponds Marina Resort's monthly rate for a long-term lease of a T-head was determined by multiplying the length of a vessel, in feet, by $7.50.[4]

### D. THE AYRES TERMINATED THEIR LEASING ARRANGEMENT WITH SPM MANAGEMENT, AND SPM MANAGEMENT BEGAN INVOICING VESSELS DOCKED OVER ADDITIONAL LANDS

In addition to renting out slips owned by North 37, SPM Management rented out condominium units on E Dock owned by Mrs. Ayres.[5] As with North 37, SPM Management would enter into slip rental agreements with customers, collect rent, deduct commission, and remit the remaining funds to Mrs. Ayres. During this time, the owners of the Sea Ayre kept the vessel in the T-head Berth free of charge, and friends of the Ayres kept boats in the slips within Additional Lands 14 and 16 without making payments to Plaintiffs SPM Management or North 37. Sometime before May 6, 2015, Mrs. Ayres stopped allowing SPM Management to rent out her condominium unit slips because she had come to believe SPM Management was renting out slips owned by North 37 before renting out the slips owned by Mrs. Ayres, to the benefit of Plaintiffs' mutual owner and to Mrs. Ayres' detriment.

After Mrs. Ayres terminated the management arrangement, on May 6, 2015, SPM Management sent her a letter stating "The T-head and Inside slips surrounding E-dock are known as Additional Land 14, 15, and 16. These parcels are owned by North 37 Management LLC (N37). N37 has contracted with SPM Management LLC for Slip Rental management Services

---

4. This rate was fair and reasonable; undisputed testimony established the rate is lower than other marinas in the area. Testimony further established the rate is fair and reasonable for T-head slips, which command a premium. SPM Management leased inside slips, which can only accommodate smaller vessels, at $7.25 per foot.

5. It appears all of Dr. Ayres interest in Units E-1 through E-8 passed to his wife, Mrs. Ayres, upon his death. On October 5, 2011, Mrs. Ayres transferred Units E-1 through E-8 into a trust, over which she was trustee. JE20. Mrs. Ayres, her daughter Elizabeth Ayres Kerr, and her son-in-law Robert Kerr often conducted business regarding the units as "Ayres Services." For convenience, this Opinion and Order refers to the units as owned by Mrs. Ayres, and refers to all actions regarding the condominium units as taken by Mrs. Ayres.

and has included Additional Land 14, 15, and 16 in this Management Agreement." JE13 at 1, 2. The letter stated Mrs. Ayres would need to begin paying the standard rate, which came to $562.50 per month, in order to dock the Sea Ayre in the T-head Berth. SPM Management also attached a "Slip Lease Agreement" for Mrs. Ayres signature. Id. Subsequently, SPM Management sent Mrs. Ayres invoices for the Sea Ayre's wharfage at the same standard, long-term rates. See JE15. The owner of a vessel docked in the slip within Additional Land 16—a friend of the Ayres—either moved the vessel or began paying SPM Management as demanded. The Sea Ayre remained in the T-head Berth, and Mrs. Ayres neither signed the Slip Lease Agreement nor paid any invoices. See JE21.

On November 11, 2016 Plaintiffs arrested the Sea Ayre and brought this suit. ECF Nos. 1-8. As of November 11, 2016, SPM Management has invoiced Mrs. Ayres $10,574.80 for the Sea Ayre's wharfage at the T-head Berth. JE15.

## II. CONCLUSIONS OF LAW

### A. NORTH 37 OWNS THE RIGHT TO ENTER INTO LEASES FOR THE T-HEAD BERTH WITHIN THE AREA DESIGNATED AS ADDITIONAL LAND 15

Plaintiffs proved they have the right to enter into leases with people for wharfage at the T-head Berth. Plaintiffs and Claimants in this case claim their respective rights by deeds that make reference to the same recorded plat, the relevant portion of which is excerpted above. The plat is unambiguous and the deeds are consistent; no claims overlap. Claimants' deed conveyed title to "Units No. E 1 through E 8 (both inclusive)" on the relevant plat and, regarding E Dock's floating pier, conveyed to Claimants "that portion of the floating pier lying within the boundaries of the above described Units." JE19 at 4. North 37's deed conveyed title to Additional Land 15, which is indicated on the relevant plat by solid black lines. Additional Land 15 borders the Channel Parcel to its West and Units E-7 and E-8 to its East. The plat plainly uses dotted lines to

6

reflect the location of the floating pier. Although most of the floating pier that comprises E Dock falls within Units E-1 through E-8, including the Eastern half of the T-head, the Western half of the T-head is clearly outside Units E-1 through E-8 and inside Additional Land 15. Any boat docked at the T-head would thus be located within Additional Land 15 and tie up to that portion of the floating pier located within Additional Land 15. Plaintiffs presented undisputed expert testimony that traced North 37's title back to the City of Hampton, although Plaintiffs recognize North 37 does not own the subaqueous floor within Additional Land 15. Thus, Plaintiffs presented perfect paper title that fixed the boundaries of all parties' real property to the land and improvements; Claimants did not present any evidence to undermine this title or the boundaries reflected in the recorded plat.

Claimants nonetheless deny that North 37 owns the T-head Berth for three primary reasons: First, they argue, the Amended Declaration allowed seven years for the Declarant who created the condominium to add Additional Land 15 to the condominium development and, when Declarant did not, Declarant's interest in that land "went poof." Specifically, they assert Additional Land 15 turned into a common area accessible only to the Ayres or was somehow transferred to the Commonwealth of Virginia. Second, Claimants argue North 37 cannot own the T-head Berth because North 37 does not own the subaqueous floor of the Salt Ponds within Additional Land 15. And third, Claimants argue Plaintiffs have not presented sufficient evidence to prove that the T-head Berth or floating pier is within Additional Land 15 because Plaintiffs did not present testimony from a surveyor expert. Claimants' arguments all fail.

Additional Land 15 did not become a common area under the Amended Declaration or transfer to the Commonwealth of Virginia when it was not added to the condominium development. In the Amended Declaration, the Declarant reserved the option for seven years to

add any area labeled "Additional Land" on the plat to the condominium development. However, the Amended Declaration explicitly provided: "the Declarant is not obligated to add any Additional Land to the Condominium," and "[i]f the Declarant does not add any or all of the Additional Land to the Condominium, the Declarant shall nevertheless have the right to [construct improvements,] . . . operate the same without restriction and to use any Additional Land for any and all purposes which Declarant deems appropriate." JE11 at SPM000036-38. It further provides, "The Declarant retains the right to enter into leases with any persons for the occupancy of . . . the improvements constructed on the Additional Land." Id. at SPM000038. Finally, the Amended Declaration reserves an access easement for the Declarant, its lessees, successors, and others, to and from the Additional Land through condominium units such as Units E-1 through E-8. Id. at SPM000036.

Claimants concede the Declarant did not add Additional Land 15 to the condominium development, see ECF No. 78 ¶ 5, but are mistaken about the effect of this decision; land that was not added to the condominium development could not become a common area in that development. Instead, title remained in the Declarant as provided in the Amended Declaration. Nor does Virginia's ownership of the subaqueous floor within Additional Land 15 mean North 37 cannot own the Western half of the floating pier improvement at the water's surface within Additional Land 15 and have the right to enter into leases for the T-head Berth. Just as Claimants can own the portion of the floating pier and berths within Units E-1 through E-8 even though they are above the subaqueous floor of the Salt Ponds, so too can North 37 own the T-head Berth within Additional Land 15. Were this not the case, nearly all condominium boat slips in Virginia would be legal nullities. Thus, the Declarant's right to use the improvements within Additional Land 15 did not disappear when the option to add that land to the condominium development

8

expired. Expiration simply established Additional Land 15 would remain under a different non-condominium form of ownership. See Va. Code Ann. § 55-79.43(A) ("Neither shall any condominium be treated differently by any zoning or other land use ordinance which would permit a physically identical project or development under a different form of ownership.").

Claimants' argument that Plaintiffs were required to present expert testimony from a surveyor in order to prevail is without merit. Claimant's own authority recognized where a plaintiff presented a deed, a recorded plat to which his deed referred, and another plat that showed the lines called for by the plaintiff's deed, that his "title was perfect and had all the elements of strength. He had located the land in dispute within the clear description of his deed." Smith v. Bailey, 127 S.E. 89, 92 (Va. 1925). As in Smith v. Bailey, Plaintiffs here have presented deeds and a recorded plat that clearly locate the land in dispute, and the relevant boundaries. Claimants presented no evidence to call into question the deeds, recorded plat, or the descriptions therein. The plat consistently reflects the coterminous boundaries between Additional Land 15 and Units E-1 through E-8.[6] In this situation, the additional evidence demanded by Plaintiff is not necessary.

### B. SPM MANAGEMENT HAS A MARITIME LIEN ON THE SEA AYRE IN THE AMOUNT OF $10,124.80.

Plaintiffs have proved they were entitled to enter into leases for the occupancy of the T-head Berth within Additional Land 15 and are therefore entitled to unpaid wharfage for the Sea Ayre's occupancy of that berth. Although Claimants disputed North 37's ownership of Additional Land 15, they do not separately dispute Plaintiffs' right to collect unpaid wharfage.

---

6. To the extent Claimants attempt to rely on the representations from the former Declarant to establish a boundary dispute, this attempt must fail. See Wade v. Ford, 68 S.E.2d 528, 530 (Va. 1952) ("'[N]o mere parol agreement to establish a boundary and thus exclude from the operation of a deed land embraced therein can divest, change or affect the legal rights of the parties growing out of the deed itself.'" (quoting McMurray v. Dixon, 54 S.E. 481 (Va. 1906)).

"Wharfage contracts are within the maritime jurisdiction of this Court, and subject to a maritime lien under the general maritime law." Humphreys Railways, Inc. v. F/V Nils S, 603 F. Supp. 95, 98 (E.D. Va. 1984) (citing Ex Parte Easton, 95 U.S. 68, 73 (1877)). "Compensation for wharfage may be claimed upon an express or an implied contract . . . when the wharf is used without [an express contract], the contract is implied and the proprietor is entitled to recover what is just and reasonable for the use of his property." Ex Parte Easton, 95 U.S. at 73.

Plaintiffs' owner, Mr. McKay, testified at trial that beginning on May 6, 2015 he sent several letters to Claimant Dolores K. Ayres, asking that she sign a rental agreement with SPM Management for occupancy of the T-head Berth. He attached the rental agreement to his letter, which applied Salt Ponds Marina Resort's standard rates to the length of the Sea Ayre and reached a total monthly fee of $562.50. JE2; JE3. The agreement also reflected a $25 fee for late payments. JE3 at 3. Mr. McKay provided undisputed testimony that the rate was reasonable because it was the rate other vessels paid for wharfage at Salt Ponds Marina Resort and it was lower than the rates charged at other nearby marinas. Mr. McKay further testified that on June 15, 2015 he sent another letter indicating that late fees would begin to accrue for Claimants' non-payment. JE21. Claimants did not sign and return the rental agreement and never made any payments.

On November 11, 2016, Mr. McKay sent Claimants an invoice for the total wharfage and late fees that had accumulated up to that date. JE4. The invoice accurately calculated the monthly fee of $562.50 per month, plus the $25 late fee per month, multiplied by the time the Sea Ayre had occupied the T-head Berth, and totaled $10,574.80. Id.

The evidence and testimony presented establish that, although the Sea Ayre previously had permission to dock in the T-head Berth without charge, Plaintiffs revoked that permission on

May 6, 2015 and demanded payment if the Sea Ayre remained in the berth. The Sea Ayre remained in the berth until it was arrested and removed. The Court finds the monthly rate of $7.50 per vessel foot is a reasonable rate for wharfage in Salt Ponds Marina Resort, and that an implied contract for wharfage existed in that amount. The Court finds there is insufficient evidence to support the reasonableness of the monthly late fee, and therefore will award the amount of SPM Management's November 11, 2016 invoice, less the late fees, for a total award of $10,124.80.

### III. CONCLUSION

Accordingly, the Court awards Plaintiff, SPM Management, LLC, a maritime lien against the SEA AYRE V, Official No. 923838, a/k/a SEA AYRE IV, her engines, tackle, equipment, etc. in the amount of $10,124.80. This amount will accrue interest at the applicable federal post-judgment rate from the date of this order.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
January 29, 2018